The second case for argument is 25-2708 from the District of Minnesota, John Doe v. Hennepin Healthcare System, et al. Mr. Frenzen, when you're prepared, please proceed. Thank you, Your Honor. I will be just a moment. Thank you, Your Honor. May it please the Court, Counsel, my name is Matt Frenzen. I represent the appellant, Dr. Laura Sloan and Hennepin Healthcare System, Inc. The District Court's denial of qualified immunity to Dr. Laura Sloan should be reversed because the care she provided to the appellee, John Doe, was not deliberately indifferent in violation of the Eighth or Fourteenth Amendment and the alleged unlawfulness of her conduct was not clearly established when she provided care to Mr. Doe. For these reasons, the Court should grant qualified immunity, dismiss all of the Federal claims against Dr. Sloan, and because the sole basis of Mr. Doe's claims against Dr. Sloan's employer, Hennepin Healthcare System, Inc., are related to the care that she provided to Mr. Doe, and because there's no underlying constitutional violation by Dr. Sloan, there can then, therefore, be no 1983 claims against her employer, Hennepin Healthcare System, Inc. Can I ask you a preliminary question, and this I've really struggled with, which is what we're considering. So we're on a motion to dismiss, and we have medical records that were quoted inside of the complaint. Yes. Are we to consider the entirety of those medical records, in your view, or just the parts of it that were quoted? That's a good question, Your Honor. In the complaint, both the initial complaint and the amended complaint, which is the operative complaint at this point, Mr. Doe quoted to and referred to several portions of the medical records. He also filed all of the medical records, so not just the records that he referred to in the complaint, but he actually filed all of his medical records and all of the jail records. From our perspective, Your Honor, those records are then bound up in the complaint, and they can be and ought to be reviewed by the court, and I will say that at our Rule 12 hearing, the district court specifically asked counsel for Mr. Doe whether or not she should be reviewing the records, and he invited her to do so, and I think he said, I have no problem with that. So it is our position that the medical records are a part of the case, even though this is Rule 12. They were referred to, quoted to, and we have, of course, in our briefing, have provided the court with, I think, the context for those records. So if we consider the entirety of the medical records, one of the things that's in those medical records is Doe's hoarding of medication or refusal to take his medication, which then caused, at least at one point, sending him over to the Hennepin County Medical Center to the adult psychiatric services for help, but then he comes back, he goes off his medication, and then we're sort of back at the first, where we were before. So I'm trying to figure out how to do that, because that's not in the complaint, but it is in the medical records. So if I could just correct Your Honor, respectfully, when Mr. Doe was caught diverting or hoarding his medications, that was in February of 2024. So that was about eight months into this, about seven months after Dr. Sloan first saw him. When he was diverting or hoarding those medications, he stopped taking his medications. He then became symptomatic. It was at that point, then, that Dr. Sloan petitioned for a Jarvis order, which I don't know if the Court's aware, but a Jarvis order allows medical providers to involuntarily provide an inmate with neuroleptic medication. But, Your Honor, it's my understanding, after now briefing this several rounds with Mr. Doe, that really the only care that he is critical of with respect to Dr. Sloan is her decision on July 14th of 2023 to not transfer him to the Hennepin County Medical Center for psychiatric care. I thought also the one a month later and the six times in, what period of time do the six visits occur with the doctor? Sure. Well, there are actually a total of nine visits, Your Honor. Yeah, but where are the six? To start with the six, I thought he used six. He did use six, but there are nine. Okay, well, what period of time are the six in and what period of time are the nine in? Sure, nine over nine months. So he was admitted on June 13th of 2023. That's when he got to the jail. Dr. Sloan didn't see him for the first time until July 14th. That's number one. She wasn't aware of him even being in the jail. It wasn't until she was prompted to visit him a month in that she saw him. She then saw him on August 11th of 2023, and that's when she had him transferred to the Hennepin County Medical Center for a week. She saw him on August 25th of 2023 when he came back, evaluated him, he was doing better. And at that time, Dr. Sloan took him off suicide precautions. He had been placed on those precautions on July 12th, was seen around the clock every 15 minutes, welfare checks while he was at the jail. She then saw him in September, October of 2023. And then I'm going off memory, but I think she again sees him in January of 2024, February of 2024 when she petitions for the Jarvis order. She sees him again in March 2024. And then she saw him about a week or so before the complaint was filed, in this case, April 2024. So that's nine visits over from July to April, nine visits. And at what point does he challenge not sending him back to the Hennepin County Medical Center for further treatment? It's my understanding, Your Honor, that that's on July 14th, 2023. Towards the end. I'm sorry. Towards the end of those visits. Beginning. July of 2023 is the first visit. He's been now in the jail context for the court. Mr. Doe was in jail, the Hennepin County Jail, for about one month when she saw him for the first time on July 14th, 2023. She did an evaluation of him. She saw what his symptoms were, tried to talk to him. He didn't want to talk to her. He didn't want to have anything to do with her. At that point, she could not force medication on him. There was no Jarvis order. She encouraged him to take his medication. There was a concern. What prompted her to see him by the deputies and the nurse was that he wasn't eating. However, Dr. Sloan's note from that visit, I believe it starts on page 741 of our appendix, notes that deputies now said he had been eating. She noticed some food wrappers and apple quarters there. Based on everything, and I should say also, she noticed that he had a history of substance abuse psychosis and that he could perhaps be on withdrawal from certain substances, and that's why he was manifesting these behaviors. So to her, at that point, exercising her medical judgment, she did not believe it had risen to the level of an emergency or he needed to go to the hospital. What's decomposition? Decomposition? Because she also has that. She doesn't just say the psychosis. Yes. What's decomposition? Decompensation, I think, is what she meant. Yeah, you're correct. Yeah, I think that's just where his condition had deteriorated over time. And so I think that she was basing that in the medical records the first time she had seen him, right? That was the first time she had seen him. Now, I guess I'm not sure exactly which, the context of that statement. I'm talking about July 14. I understood at that time, and you're correct, that the diagnoses were the psychosis and decompensation. Correct. She had the base decompensation on the records, right? That's correct. That's correct. Yes. You know, Your Honor, there's no question that Mr. Doe is and was mentally ill. There's no question about that. But I think what Dr. Sloan is looking for, and there's a visit from June 23, a couple weeks earlier from a nurse. She also had to make a decision about whether to send him to the hospital, and the question there was she didn't send him because he was presenting no harm to himself or others. What about her statement on July 14 that she would monitor closely for a possible transfer? Those are her words, and then nothing happens to August 11. I think it says monitor closely. I don't know that it says she would monitor closely. I thought she wrote it. I thought she said. Well, Your Honor, my understanding of monitor closely is it's not only Dr. Sloan, but it's also nurses. And I believe between her visit on July 14, 2023, in which she sees him again on August 11, I believe he was seen 13 times by various medical providers, nurses. He's also seen around the clock every 15 minutes by deputies. So I think the way it works is was there a concern? If there was a concern by a nurse, if there was a concern by a deputy, that's going to get to Dr. Sloan. That didn't happen. Now, I know during there he sort of waxed and waned, but I think it's critical to note. Are those other caregivers part of this lawsuit? They are not. They are employees of Hennepin Healthcare System, Inc., but they are not named as defendants, and there is no claim that's been directed against them in the medical records. It's only Dr. Sloan. I want to cut the chase a little bit here, which is she couldn't forcibly medicate him, right, at that point, because she didn't have a Jarvis order. Right. She saw that he was decompensating, and so she couldn't really do anything about it that I can see. So at that point, I think the claim boils down to should she have sent him somewhere where they could help him? And apparently, and hindsight's 20-20, but if this happened at the beginning, my understanding is Hennepin County Medical Center did help him because for at least a while he was, you know, he was better. And so my question for you is why shouldn't that have happened earlier, and why isn't there a live dispute as to that? In the medical profession, Your Honor, they call that the retrospective scope, meaning it's easier where we are now to look back and see what happened. Dr. Sloan, of course, is working prospectively. She's looking forward. She made a medical judgment that there was no basis at that time to send him. Could she have? Yes. And even if the court were to determine, you know, we think she should have, I still think that boils down to medical judgment. And when you start talking about medical judgment, that gets into negligence. And as the Court knows, negligence, even gross negligence, does not rise to the level of deliberate indifference. We can criticize that decision and we can second-guess it, we can Monday morning quarterback it, but this prong of deliberate indifference is a subjective standard. We have to look at what she had in front of her, what she knew. What she had in front of her was an evaluation of Mr. Doe, given his experiences, his past experiences with this substance-induced psychosis, his other diagnoses, and what she saw in front of her. So is the allegation that it was the absence of care as opposed to faulty care that created an unreasonable condition for the plaintiff? Your Honor, I think the word that they used in the brief was a lack of action, is what they described it as. Which would be the absence of care, not negligent care, not poorly done care, but just there wasn't care. That's what they claim. That's correct, Your Honor. I would argue, however, that the fact that she's evaluating him, encouraging him to take his medications, that is medical care. I understand now they say he's taking his medications at that point. I mean, that's what I'm unclear about. Do we know from the record? And I apologize, I didn't mean to interrupt. I just don't know the record on this. Yeah, I think between from the time he came to the jail on June 13th until Dr. Sloan saw him on July 14th, I think it was hit or miss on medications. And I will say generally from the time he got to the jail until he was transferred to the hospital, those two months, that two-month period of time, he waxed and waned. As we noted, sometimes he was cooperative, sometimes he was not. Sometimes he took his time out of his cell, was allowed to get out of his cell. Sometimes he did not. So he was up and down. Counsel, you say out of cell. He was rarely out of his cell, only three hours outside his cell, right? That's correct. Yeah, in that whole period of two months. That's correct. True solitary confinement, right? Yes. And I will note, Your Honor, Dr. Sloan was not involved in any of those sort of decision-making about how he was segregated. But she could see the effect of it. Yeah, I think there is no doubt that certainly solitary confinement is probably not a healthy place for anybody. But I do think that there was probably a pretty good penal justification for it, given what brought him to the jail. But to be clear, Dr. Sloan was not involved in any of that decision-making. I have just under two minutes left. Unless the Court has questions, I'll reserve my time. Thank you. Thank you, Mr. Franzen. Mr. Rich. Thank you, Your Honor. May it please the Court. Counsel, my name is Kevin Rich. I represent the plaintiff, John Doe, in this action. I think I can help clear up some of the questions that were asked during the appellant's argument. Our claim is that Dr. Sloan provided no care for the first two months of Mr. Doe's confinement in the jail, that the failure to provide care was deliberately indifferent. In our complaint, we plead at length how simply monitoring someone who is floridly psychotic is not care. But she couldn't make him take his medication. I mean, I don't know if there's evidence that he was or wasn't taking his medication. It sounds like they didn't know at that point. But at that point, she couldn't force him to take his medication. Well, first of all, not taking one's medication is a commonly recognized symptom of mental illness, probably why mental illness is so insidious, because one of the primary drivers of a patient's symptoms and suffering is the illnesses causing them to not take their medication. And so they're not like a normal patient who's being seen for a physical illness who's making a rational choice about taking medication. When an individual is floridly psychotic like Mr. Doe was, he doesn't know who he is. He doesn't know where he is. He doesn't know who the people who are addressing him are. He's filled with paranoid delusions. And that is why there's a system in place to deliver involuntary neuroleptic medication to patients who are psychotic. So is the claim, because you identified, I think, already the two options that were available to her. I want to know if there's anything else. It was either get a Jarvis order to forcibly medicate or a cell order under federal law, or send him to a hospital for treatment. And is there a third option that she had in front of her? We are focused on those two options thus far in this case. Again, part of the issue with addressing these questions at this stage of the proceeding, we don't have any testimony from Dr. Sloan. We don't have any testimony from the mental health nurses. We have medical records. Mr. Franson represented that we have all medical records. I don't know that we have all medical records. Are there allegations or statements in the complaint about what the standard of care should have been or was for the care provided by the doctor? Yes. And the standard of care and what should have happened is what did happen in August, which was she sent him someplace where he could get the care he needed. I mean, the proof of what needed to happen here is in the facts that played out after he received treatment. He went to the APS. He stabilized almost immediately. A note from Dr. Sloan in August of 2023 states that he was thin, disheveled, malodorous, rambling nonsensically, that they were concerned because he was potentially starving to death. He had been locked in a 6 by 10 cell for three months, naked most of the time. This is something out of a Dickens novel. And she, with a stroke of a pen, had him transferred to the APS where he recovered almost immediately and was stable for months after that. And so that is something she could have done in June, something she could have done in July. I mean, it could have been done at any step along the way of the number of times when Doe was visited by mental health nurses or Dr. Sloan recognizing that he was suffering fluorid psychosis. And are you challenging the, as opposing counsel said, just June, or really July, July to August, maybe June to August on the front end, or is there something else you're challenging as well? The question of whether or not the care in the beginning of 2024 constituted deliberate indifference is a much closer call. I think, you know, there was a point where he decompensated again. He stopped taking his medication. There was some delay in providing him involuntary medication. And doctors can provide involuntary medication. There's hoops they have to jump through, but like any kind of aspect of practice, there's things they have to do to deliver the care they need to deliver. Whether or not that was deliberate indifference in 2024 I think is a much closer question. I don't think there's any question that simply allowing a psychotic individual to sit in a six-by-ten cell and somehow place the onus on him, that he should have been asking for help, that he should have been taking his medication, the disease that needs to be treated prevents him. That's a symptom of the disease. So I'm not sure you answered my question, though. You said that you think that it's a closer question later. I'm just trying to figure out what's before us, not necessarily what's the closest question. Are you urging us to look at that narrow period in the front or the entire period, including that later period? I think maybe a way to frame that answer is if the court determines that the lack of care in June through August constitutes sufficient deliberate indifference at the stage in the process to affirm the district court's denial of qualified immunity, it doesn't need to get to the spring 2024 situation. I'm going to press you. What if we don't agree with you on that? Then do we still need to address the spring situation? I don't. I think you might need to, but I don't think the answer will be any different because the care provided then was closer to something that would approximate what a person should do. And whether or not it was three weeks or two weeks is sort of a fact question that needs to be addressed in discovery through expert testimony and through the testimony of Dr. Sloan and the other providers who treated Mr. Doe. But if the answer to June and July is no, then the answer to 2024 is clearly going to be no. And do we look at all of the medical records? That was a question I asked of opposing counsel. You quote what I think are probably the most favorable towards the complaint towards your client, but there's other parts that are not quite as favorable, I think. And so, you know, you urge the district court to look at those medical records. Is that what you're urging us to do or don't care much if we do it on appeal? I think that those medical records are fair game. They were filed as part of the injunctive component of this case, because there was a preliminary injunction proceeding in front of Judge Brazel. They weren't filed as attachments to the complaint or anything. That said, I don't think that changes the court's posture on appeal, that you have to construe all the facts in the light most favorable to the plaintiff at this stage in the proceeding. But would we then be functionally doing a summary judgment review? Well, that is the concern with relying on those records as the sole basis for reversing the record. But didn't you say it was okay for the district court to rely on them, counsel? I did, Your Honor. Okay, great. I did. And I think that if you look at them, there are records in there that definitely cut against the arguments that were made by the appellant standing before you, primarily that Dr. Sloan was not aware, didn't know what was going on with Mr. Doe prior to when she saw him on July 14th. There are numerous notes in the weeks prior of mental health nurses scheduling appointments with Dr. Sloan and noting that they were updating Dr. Sloan on his mental health condition. On Appendix 737, there's a note from mental health nurse Thomas. This is June 16th. It says, Patient has an upcoming mental health appointment on the schedule with Dr. Sloan. On June 22nd, mental health nurse Willis says, Patient has an appointment coming up with on-site provider. That's Dr. Sloan. Will update mental health provider. That's Dr. Sloan. This is June 22nd, and the rest of the notes show them assessing. They don't mention specific dates, though, right? They just make that general statement? Correct. They don't say an appointment on X date? Correct. Or to put it plainly, there are no indications, I don't think it was brief, of canceled appointments. That is also correct. And, again, at this stage, the facts need to be construed and inferences drawn all in favor of plaintiffs because we're just on a motion to dismiss here. And there are additional on June 22nd. There's another. Appointment will be scheduled for patient to be seen ASAP given his possible self-injury and history of severe mental health issues. On June 23rd, we'll order mental health visit for further evaluation and management. So these nurses are repeatedly making appointments with Dr. Sloan to come see Mr. Doe because of his mental health crisis. And I think it's important. Well, does the record reflect the complaint in these medical records? Do the medical records reflect that she ever saw him? No. She did not see him, and we know that because of the record. Well, then wait. How do you know she didn't see them? I often go to the doctor, and they're looking at another doctor's notes because they're all in the same big health system. Well, I think construing the facts in the light most favorable to the plaintiff with the absence of any indication of the record that she saw him before July 14th, the appropriate inference that can be drawn, and the most favorable inference that can be drawn to plaintiff is that she did not see him before that date. And if she did, I don't know that that would move the ball at all for the appellant. As we pled, at length in the complaint, when an individual is suffering untreated psychosis, they are being harmed. And so simply monitoring somebody who is psychotic and doing nothing else is harmful to that person temporarily and permanently. And we went at length to plead in the complaint, and we attached an expert affidavit to the complaint explaining that untreated psychosis causes permanent harm. An analogy would be someone who is suffering a stroke. Because we know now, we didn't know 30, 40 years ago, mental illness is a physical illness. That's why medication treats it and can relieve symptoms and prevent physical damage to the brain. And what you'll see in the expert affidavit attached to the complaint, allowing it to go untreated causes physical harm. And Dr. Sloan knew that, and we pled that in the complaint as well. When Doe was left in the cell naked, unshaven, starving, rambling nonsensically, and screaming all night long for days and days and days and days, with no one doing anything except peeking in through the window to see if he had hung himself, that was causing him harm. And it was deliberately indifferent to not provide him some treatment to relieve the symptoms that were afflicting him. The symptom of refusing the medication, which is the one way to help him stabilize and recover from all this. The failure to get him someplace where he could get that medication and treatment he needed. And again, the proof is in the pudding with what happened after he was transferred. What was the rationale? Or is it in the pleadings for not making a referral or not getting him into the hospital? Was it a matter of bed space or that type of restriction? Is there a reason? Deliberate indifference is the reason. Deliberate indifference is there is no reason articulated why they could not have done something. Either transferred him, involuntarily medicated him. Yes, they would have had to fill out the Jarvis or the paperwork. That's part of the job of providing medicine to people who are in healthcare to people who are mentally ill. And if you don't take the step of doing that, you're being deliberately indifferent, especially if you know that the person is psychotic and that the person is decompensated. Mr. Doe was in the jail because he stabbed his father during a psychotic episode. When he showed up at the jail, they knew he was psychotic. On a Jarvis order, my recollection is that has to go before a judge. It's not as easy as just filling out the paperwork. I know it's a cell order in federal court that has to go through a judge. So you made it sound like you could just magically wave a pen and then once he filled it out, he gets to involuntarily medicate him. That's true. It does have to go before a judge, but there are variations on the speed and exigency with which you can get an involuntary Jarvis order within hours if sufficient facts are pled in a petition that established the person needs medication immediately. Regardless, none was filled out. No judge ever saw the petition. As soon as the judge saw the petition for a Jarvis order, it was promptly granted. Mr. Doe received the medication he needed and he got better, which is what was supposed to happen. The problem we have and the reason why this lawsuit was filed was because he sat for months in solitary confinement. And Dr. Sloan knew that that aggravated his mental illness. Not only was Doe suffering from untreated florid psychosis, he was in a contra-therapeutic environment, which is also pled in the complaint and in our expert affidavit. Well, what do you do about the fact, and I'm trying to figure it out, but you heard opposing counsel say she wasn't involved in any of those decisions. On the other hand, you can say, well, she had knowledge of them. She knew he was there. And so she couldn't move him. That's clear. I mean, that wasn't part of her therapeutic duties, I think. But maybe I'm wrong about that. She did move him. Well, I know, to the hospital. She couldn't move him to another cell inside the jail, I don't think, unless there's some allegation of that. We have not pled the allegation that she had the ability to do that. I don't think we know if she had the ability to do that. We do know she had the ability to transfer him to the hospital, which she did. And then he stayed there until he was stable, no longer psychotic, and was discharged. The issue of the contra-therapeutic environment is less acute once the psychosis has abated because he's stable and so he's not suffering the same way that a psychotic person does in solitary confinement. On top of that, well, I'll leave it at that unless the Court has any questions. Yes, I do. And I'm sorry, I don't really know this, but on July 14, when she made the evaluation and the diagnoses, how is the monitor closely sentence written? Do you know? Is there a subject? The other side implied that it was just a general statement, monitor closely. I should have looked that up. We'll find out. I don't know. Well, we could have, too. Go proceed. And, again, I don't know that it necessarily matters, Judge. I mean, I think it implies that she believed he needed to be checked on regularly and she needed to, the purpose of monitoring closely was to provide her with more information, either because she was the one monitoring or somebody else was monitoring, conveying that to her. But those two words were definitely used, monitor closely. Correct. Right, with her diagnosis monitored. Correct. And above and beyond that, as I indicated earlier, monitoring someone who is undergoing fluorid psychosis is the same as monitoring someone who is having a stroke. Their brain is being damaged. Just watching somebody have a stroke to see if they've passed out yet is not adequate treatment, just like watching someone who is mentally ill decompensate in a cell to check and see if they've hung themselves yet is not adequate health care treatment. Thank you, Mr. Rich. Thank you, Your Honor. Thank you. If I might just follow up on this discussion about what happened in June of 2023. My friend, I think, just made a lot of allegations that are news to me. He referenced on, I believe, page 737 of our appendix, these upcoming on-site provider visits. But I believe my friend used the word Dr. Sloan. I'm looking at these on-site provider notes here from June 22nd at page 737. Appointment coming up with on-site provider. We'll update mental health provider. Above that, scheduled for... Is Dr. Sloan the mental health provider or not? She is, but here's why the date is important, Your Honor. Okay. This is happening June 22nd. He is seen by a mental health nurse who is a mental health provider the next day on June 23rd. And that provider is the one who made the initial determination about whether or not he needed to go to the hospital. So given the timing, this mental health provider appointment, checkup with the mental health provider, that happens on June 23rd the next day, but with a mental health nurse at page 735. You said there were several of these. There were, yes. But given the timing of this, those notes were from June 22nd, a mental health provider, a psychiatric nurse evaluates him on June 23rd, not Dr. Sloan. And I think it's important to underscore, Your Honor, there is no evidence anywhere. You're saying there's that generic term that doesn't identify an individual. It does not. That individual could be Dr. Sloan. It could be, but given what then happened. This sounds like not the sort of thing that a motion to dismiss would resolve or should be the instrument for resolution. But I think given the timing then, Your Honor, what a mental health provider, the psychiatric nurse sees for the next day, and that then makes the evaluation. My time is running out, but I just want to note real quick, if I may, Your Honor, this Zorn case. We haven't talked about clearly established law. Zorn talks about, this was three months ago, a Fourth Amendment case. Counsel, I'll give you one minute. You've used up your time. Thank you, Your Honor. Don't push it. Okay. Do you want me to finish or should I be done, Your Honor? Well, you're kind of going into a new area on your rebuttal, but I'll go ahead and. . . Okay. Thank you. Just wanted to note this clearly established case that came out from the Supreme Court three days before we filed our reply brief. It's a Fourth Amendment case involving officers involved in arresting people. They say, Officers receive qualified immunity unless they could have read the relevant precedent beforehand and had known that it prescribed their specific conduct. And I think the point here is, Your Honor, no clearly established law has been identified by the district court or by the appellee that suggests that Dr. Sloan would have known on July 14, 2023, that what she was doing was prescribed by the Eighth Amendment. And I think that's important. Thank you, Your Honor. I appreciate the indulgence. Thank you. Thank you, Mr. Franzen. The Court appreciates both counsel's participation and argument. And the briefing you've supplied to the Court, we'll continue to study the matter and render decision in due course. Thank you.